In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 17-1575

ILLINOIS DEPARTMENT OF REVENUE,

*Appellant,*

*v.*

HANMI BANK AND EUGENE CRANE, TRUSTEE,

*Appellees.*

———————————

Appeal from the United States Bankruptcy Court for the
Northern District of Illinois, Eastern Division.
No. 12-49658 — **Timothy A. Barnes**, *Bankruptcy Judge.*

———————————

No. 17-2004

ILLINOIS DEPARTMENT OF REVENUE,

*Appellant,*

*v.*

FIRST COMMUNITY FINANCIAL BANK,

*Appellee.*

———————————

Appeal from the United States Bankruptcy Court for the
Northern District of Illinois, Eastern Division.
No. 15-05384 — **A. Benjamin Goldgar**, *Bankruptcy Judge.*

_____

ARGUED DECEMBER 1, 2017 — DECIDED JULY 9, 2018

_____

Before BAUER, FLAUM, and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. The bankrupt businesses in both of these consolidated appeals had debts that far exceeded the value of their assets. The bankruptcy court authorized the sale of the firms' principal assets (several gasoline service stations and a movie theater and café), and those sales qualified as bulk sales under Illinois statutes we shall refer to as the Bulk Sales Provisions. Among other things, the Bulk Sales Provisions give the Illinois Department of Revenue ("IDOR") the right to pursue the purchaser in a bulk sale for state taxes owed by the seller. However, in order to facilitate sale of the debtors' properties, the bankruptcy court, pursuant to section 363(f) of the Bankruptcy Code, allowed the sales to proceed free and clear of the interests in those properties held by any entity other than the bankruptcy estates, including IDOR's interest under the Bulk Sales Provisions. 11 U.S.C. § 363(f). This meant that IDOR lost its right to impose successor liability on the purchasers for the taxes owed by the sellers. Pursuant to section 363(e) of the Code, a party whose interest has been removed from property in this way is entitled to "adequate protection," which typically takes the form of a payment from the sale proceeds to compensate the party for the decrease in value of its interest. *See id.* §§ 361, 363; *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 548 (7th Cir. 2003). The bankruptcy court in each case below agreed or assumed that IDOR was entitled to adequate protection for its interest under section 363. But the court also went on to conclude that

because the sale proceeds were insufficient to satisfy the claims of the senior-most creditors (the banks that held the mortgages on the properties), IDOR was entitled to no portion of the sale proceeds; to grant IDOR any share in those proceeds would be to impermissibly allow it to "jump the queue" of creditors. And because there were no other assets available from which to compensate junior creditors like IDOR, IDOR was left with nothing.

IDOR contends that the bankruptcy court's disposition fails to account for its authority, which other creditors did not enjoy, to pursue not only the debtor but the purchaser of the debtors' property—personally—for unpaid taxes. When the bankruptcy court authorized the sale of the debtors' properties in these cases free and clear of IDOR's interest, it made the properties much more attractive to prospective purchasers than they otherwise would have been. Consequently, in IDOR's view, the final sale price for the properties necessarily included consideration for the removal of IDOR's interest, and it is entitled to a share of the sale proceeds pursuant to sections 361 and 363(e) to compensate it accordingly.

For the reasons that follow, we affirm the bankruptcy court's judgments. We agree with IDOR that the Bulk Sales Provisions give it a powerful means of securing payment for delinquent taxes that most other creditors lack, and that removal of IDOR's interest likely increased the price bidders were willing to pay for the debtors' properties in these cases. But assuming that IDOR's interest is cognizable under section 363, it has not given us a realistic assessment of the value of its interest. IDOR's position in these appeals is that it is entitled to a share of the sale proceeds equal to 100 percent of the taxes it was authorized to collect from the purchasers, given

that it was forced to give up its right to pursue the purchasers for those taxes. As we explain, however, we are skeptical of the notion that IDOR necessarily would have recovered 100 percent of the tax delinquency from an informed purchaser; and although IDOR might have been able to strike a deal with the purchaser and the seller's senior creditors giving it some lesser payment on the outstanding taxes, IDOR has offered no evidence to establish what its potential recovery might have been. In short, its claims were properly denied for want of evidence enabling the bankruptcy court to assign a reasonable value to its interest for purposes of section 363(e).

## I.

These appeals involve two different sets of debtors. The Elk Grove debtors owned and operated five BP gas stations in Elk Grove Village and other Chicago suburbs. Hanmi Bank, formerly known as United Central Bank (hereinafter, "UCB"), held mortgages on the real properties along with security interests in the personal property at each location. The Naperville debtor operated a cinema and adjoining café in the Chicago suburb of Naperville. First Community Financial Bank ("First Community") held the mortgage on these properties.

The debtors initially sought relief under Chapter 11 of the Bankruptcy Code. In each instance, the debtors' outstanding liabilities substantially exceeded the value of their assets. The Elk Grove debtors owed north of $14 million to UCB, and the Naperville debtor owed just under $4 million to First Community. Both debtors also owed substantial Illinois taxes to IDOR: the Elk Grove debtors owed the state more than $1.8 million in sales, employee withholding, and motor fuel taxes (approximately $1.38 million of which was secured by liens on the debtors' properties) and the Naperville debtor owed

nearly $600,000 in sales and withholding taxes (none of which was secured by liens). In the Elk Grove proceeding, a trustee was appointed at the request of the creditors.

The Elk Grove trustee and the Naperville debtor both sought the bankruptcy court's approval pursuant to section 363(b) and (f) of the Bankruptcy Code to sell the debtors' principal assets—the gas stations and the theater/café—free and clear of all liens, claims, encumbrances, and interests held by entities other than the estate. In each instance, IDOR contended that to the extent the court deemed its right to impose successor tax liability on the purchaser of the property an "interest" that could be extinguished pursuant to section 363(f), the court should set aside a portion of the sale proceeds sufficient to satisfy the outstanding tax obligations as "adequate protection" for IDOR's interest pursuant to section 363(e), regardless of the fact that IDOR's claims against the debtor were junior to those of the banks. In both cases, that request was denied.

In the Elk Grove case, Judge Barnes denied the set-aside request but directed the trustee to hold the proceeds of the sale subject to a further order of the court, so that IDOR's right, if any, to a share of the sale proceeds could be assessed. After the sale of the gas stations closed, yielding net proceeds of roughly $5.23 million, UCB asked that its secured claim against the estate be allowed and that the full proceeds of the sale be turned over to it (recall that the debtors owed UCB more than $14 million in total). IDOR objected to UCB's request, insofar as it sought the turnover of all proceeds to UCB, and asked that a portion of the proceeds equal to the amount of unpaid taxes that IDOR could have collected from the purchaser pursuant to the Bulk Sales Provisions—roughly $1.53

million—be turned over to IDOR first, with the remainder go-
ing to UCB.[1] IDOR contended that its interest in the sale pro-
ceeds was effectively superior to UCB's in view of the fact that
IDOR had the authority—before the bankruptcy court al-
lowed the sale free and clear of all interests—to hold the pur-
chaser of the property personally liable for the unpaid taxes.
In IDOR's view, because it was entitled to "adequate protec-
tion" for its interest pursuant to section 363(e), it was owed
full recompense for the taxes it was owed.

Judge Barnes allowed UCB's claim in full and denied the
relief that IDOR requested. *In re Elk Grove Vill. Petroleum*, 510
B. R. 594 (Bankr. N.D. Ill. 2014) ("*Elk Grove I*"). He determined
that UCB had a secured claim that exceeded by some $8 mil-
lion the amount of the sale proceeds; that IDOR had a par-
tially secured but junior claim of $1.88 million (secured by
liens to the extent of $1.38 million); that IDOR's successor lia-
bility claims under the Bulk Sales Provisions constituted an
"interest" that could be extinguished in the sale of the gas sta-
tions pursuant to section 363(f); but that IDOR's interest had
not decreased in value by virtue of the sale, such that it would
be entitled to adequate protection under section 363(e), be-
cause that interest was inferior to UCB's security interest both
before and after the sale. *Id.* at 603–05. Judge Barnes acknowl-
edged that, by virtue of the court's free-and-clear order under

---

[1] The figure of $1.53 million to which IDOR claimed it was entitled was
less than the total of $1.88 million in unpaid taxes it was owed by the Elk
Grove debtors. As we discuss below, the Bulk Sales Provisions cap a pur-
chaser's liability for the unpaid taxes at the reasonable value of the prop-
erty, which would normally be reflected in the sales price of the property.
The taxes owed by one of the five gas stations substantially exceeded the
sales price for that station. Consequently, as to that station, the purchaser's
prospective liability for the delinquent taxes was capped by the sales price.

section 363(f), IDOR had lost the ability to pursue the purchaser of the property for the unpaid taxes. *Id.* at 605. But other creditors with liens on the debtors' property had likewise lost the ability to enforce those liens against the purchaser of the property. Had the sale taken place with all such liens, encumbrances, and interests in place, IDOR still would have taken nothing, the court believed, as a creditor whose claims were inferior to those of the bank. *Id.* (The judge did not consider IDOR's right to pursue the purchaser personally for the delinquent taxes.) Thus, IDOR's interest had not, in practical terms, decreased in value by virtue of the court's free-and-clear order. "IDOR was out of the money prior to the [s]ale and would remain out of the money subsequent to the [s]ale, whether or not section 363(f) is applied." *Id.* Therefore, IDOR was not entitled to adequate protection under section 363(e) in the form of compensation from the sale proceeds.

In the Naperville case, Judge Goldgar simply overruled the debtor's request outright. Recall that First Community was owed $3.92 million on the loans it had made to the Naperville debtor, and First Community, by virtue of the promissory notes underlying those loans, had a first-priority security interest in the debtor's property. IDOR, for its part, had an unsecured claim in the amount of $593,000 for unpaid sales and withholding taxes. When the debtor sought the court's approval to sell its property, IDOR filed a limited objection to the sale, insisting that it was entitled to direct payment from the sale proceeds pursuant to section 363(e) as adequate protection of its interest under the Bulk Sale Provisions. Absent assurance of such payment, IDOR argued, the sale could not be approved. Looking to Judge Barnes' decision in *Elk Grove I*, Judge Goldgar overruled the objection, authorized the sale of the debtor's property, and allowed First Community to

take and apply the proceeds (after certain fees and carve-outs) to the debt it was owed. *In re Naperville Theater, LLC*, No. 15 B 05384, R. 127 at 7, 23. As in the Elk Grove case, IDOR would take nothing from the sale proceeds. The Naperville case, like the Elk Grove Village case before it, was later converted to a Chapter 7 proceeding and a trustee was appointed.

IDOR appealed in both cases. In the Elk Grove case, Judge Blakey vacated the bankruptcy court's order in part. *Ill. Dep't of Revenue v. Elk Grove Vill. Petroleum*, 541 B.R. 673 (N.D. Ill. 2015) ("*Elk Grove II*"). As the appellees did not dispute the point, Judge Blakey assumed that IDOR's right to impose successor liability on a bulk-sale purchaser for delinquent taxes constituted an interest warranting recognition and protection pursuant to section 363. *Id.* at 676. He therefore focused on whether that interest had any concrete value for which IDOR was entitled to protection under section 363(e). Judge Blakey noted that the "adequate protection" called for by section 363(e) is intended to prevent—*i.e.*, compensate for—a decrease in value of the creditor's interest in property that has been extinguished pursuant to section 363(f). *Id.* at 677 (citing § 361). That decrease is properly calculated by comparing what the creditor will recover in bankruptcy where its interest in property has been extinguished pursuant to section 363(f) with what its recovery would have been had its interest remained intact. *Id.* at 678. As to the first question, the judge agreed that UCB's interest was superior to that of IDOR and the Bulk Sales Provisions did not permit IDOR's interest to jump ahead of UCB in the queue of creditors and have first bite at the sale proceeds. *Id.* But as to the second question, Judge Blakey was not convinced that IDOR again would have been left "out of the money" (as Judge Barnes had assumed)

had the sale taken place subject to IDOR's interest. Notwithstanding the fact that UCB had a superior claim to the sale proceeds themselves, the Bulk Sale Provisions gave IDOR the right to look beyond those proceeds and pursue the purchaser personally for the unpaid taxes. Thus, allowing the sale free and clear of IDOR's interest indeed may have caused its interest to decrease in value, as it eliminated IDOR's ability to hold the purchaser personally liable for the taxes. To that extent, IDOR might be entitled to compensation. *Id.* at 679. The court remanded the matter for development of the record and resolution of two issues: (1) what IDOR would have recovered from the purchaser had the service stations not been sold free and clear of its interest under the Bulk Sales Provisions; and (2) by what means IDOR could be compensated for the value of this interest pursuant to section 363(e) given, inter alia, the relative priority of UCB's liens on the property and the depletion of estate assets. *Ill. Dep't of Revenue v. Elk Grove Vill. Petroleum, LLC*, 2015 WL 8481961, at *4 (N.D. Ill. Dec. 9, 2015) ("*Elk Grove III*").

On remand, the bankruptcy court again denied IDOR relief upon addressing the two issues the district court had tasked it to consider. *In re Elk Grove Vill. Petroleum, LLC*, 562 B.R. 708 (Bankr. N.D. Ill. 2016) ("*Elk Grove IV*"). In valuing IDOR's interest, Judge Barnes drew a distinction between the calculable value and realizable value of the interest. The interest had a nominal, calculable value of $1.53 million—*i.e.*, the amount that IDOR theoretically could collect from the purchaser pursuant to the Bulk Sales Provisions, *see* n.1, *supra*—but in the judge's view, the realizable value of the interest was effectively zero, as there was no realistic possibility that IDOR would ever have been able to collect on the unpaid taxes notwithstanding its rights vis-à-vis the purchaser. So far as the

record revealed, the purchaser of the gas stations was a spe-
cial-purpose entity with no assets other than the purchased
stations themselves; so, apart from waiting to see if the sta-
tions turned a profit in the future, there would be nothing
other than the properties themselves to which IDOR could
look as a source of payment. *Id.* at 719 n.11. And if the stations
had been sold without a section 363(f) free-and-clear order,
leaving IDOR's interest intact, then it was fair to assume that
UCB's interest as the debtors' lender also would have re-
mained intact. *Id.* at 718–19. Because the purchase price for the
stations did not come close to paying off the debt to UCB, and
its interest was senior to that of IDOR, UCB as the senior
lienholder would have a superior claim against any funds the
purchaser had set aside on instructions from IDOR to account
for the delinquent taxes as well as a superior right to enforce
its liens on the purchaser's sole asset—the stations them-
selves. *Id.* at 720. Once again, IDOR, as the junior creditor,
would be left with no source of payment for the unpaid taxes.
Given that IDOR was likely to recover nothing regardless of
the operation of section 363(f), there was no need to consider
how, logistically, IDOR could be given adequate protection in
the form of cash compensation pursuant to section 363(e); its
interest had not been diminished as a result of the court's free-
and-clear order. *Id.* IDOR had already been given all the pro-
tection to which it was entitled by virtue of the court's sale
order, which allowed IDOR's interest, such as it was, to follow
the sale proceeds. *Id.* at 720–21. To the extent IDOR was seek-
ing payment from those proceeds, it was asking the court to
reorder the creditor queue and give IDOR a first-priority sta-
tus which the law did not allow:

> Nothing in the Sale Order ensured a recovery on
> the preserved interests in the Proceeds. They

must still be weighed against the priorities of all parties whose interests were also preserved; in this case, the priority of the UCB liens that were also attached to the Proceeds. By arguing that the court must permit IDOR a recovery on the preserved interests above that afforded UCB, IDOR attempts to use sections 361 and 363(e) to afford the IDOR Claims a step up in priority. …

Had Congress wanted to upset the Bankruptcy Code priority schemes in this respect, it could have done so. But nothing in sections 361 or 363(e) has that effect. Had the court found realizable value for the Successor Liability Interest outside of bankruptcy, the court would nonetheless be forced to conclude that, under the facts of this case, IDOR has identified no bankruptcy source of recovery for the same.

*Id.* at 722.

In the Naperville case, Judge Der-Yeghiayan likewise ordered a remand for a determination as to the value of IDOR's interest. *In re Naperville Theater, LLC*, 2016 WL 930659 (N.D. Ill. Mar. 10, 2016). In the absence of a live dispute on the point, the court assumed that IDOR's rights under the Bulk Sales Provisions constituted a cognizable interest under section 363(e) and (f).[2] Following Judge Blakey's decision in *Elk Grove*

---

[2] Judge Der-Yeghiayan assumed that because Judge Goldgar had adopted Judge Barnes' decision in *Elk Grove I*, he necessarily agreed that IDOR had an interest that was cognizable and entitled to adequate protection under section 363(e). *Naperville Theater*, 2016 WL 930659, at *2. Judge Goldgar would later clarify, however, that he had not meant to hold that IDOR had a protectable interest, but rather had "passed [the issue] by," as IDOR's

*II*, Judge Der-Yeghiayan concluded that Judge Goldgar had improperly placed the value of IDOR's interest at zero, which did not account for IDOR's right to pursue the purchaser of the debtor's property personally for the unpaid taxes. *Id.* at *3. It remained for the bankruptcy court to ascertain what value, if any, to place on that right, which was extinguished with the sale of the debtor's assets. *Id.* The court left open the question whether IDOR was entitled to any compensation for its interest, believing it "premature" to reach that issue until such time as the bankruptcy court had determined what value to assign to IDOR's interest. *Id.* at *2.

On remand, Judge Goldgar, like his colleague Judge Barnes, concluded that IDOR's interest had no realizable value and that, consequently, IDOR was not entitled to any compensation for the extinguishment of its interest. Judge Goldgar had convened an evidentiary hearing in order to give IDOR the opportunity to put on evidence as to the value of its interest. IDOR presented testimony from a representative of the buyer of the debtor's theater and café, who testified in essence that the buyer would not have purchased the estate's assets without the removal of the interests of IDOR and other creditors. IDOR thus reasoned that because the extinguishment of its interest (along with those of other creditors) made the sale of the debtor's assets possible, it was entitled to compensation for its interest. But in Judge Goldgar's view, the relevant question was whether IDOR could, ultimately, have recovered on its interest, and there was "a total failure of proof on that point." *In re Naperville Theater, LLC*, No. 15 B 05384, R. 195 at 19. In other words, there was no proof as to the financial

---

claim could be resolved without deciding that issue. *In re Naperville Theater, LLC*, No. 15 B 05384, R. 195 at 14.

status, assets, or resources of either the entity that had purchased the theater and café from the debtor (Brixmor Holdings 6SPE, LLC), or the entity that had in turn purchased those properties from Brixmor (Star Theater). *Id.* Given the lack of proof that IDOR's interest had any value, the inevitable conclusion was that there was no decrease in the worth of its interest and therefore IDOR had no entitlement to compensation pursuant to section 363(e). *Id.* at 20. "As far as the evidence showed, the Department's successor liability claim was worthless." *Id.* at 21.

IDOR again appealed in both cases. We granted the parties' joint request pursuant to Bankruptcy Rule 8006(g) for leave to appeal the adverse judgments of the bankruptcy court directly to this court.

## II.

The essential question posed in these appeals is whether IDOR received adequate protection for its interest in the debtors' properties when those properties were sold, with the bankruptcy court's permission, free and clear of IDOR's interest in compensation for unpaid taxes. The bankruptcy courts concluded, in essence, that because IDOR had not shown that the purchasers had assets apart from the purchased properties from which IDOR could have collected the unpaid taxes had the sales taken place with its interest (and its right to pursue the purchasers personally) intact, its interest had not decreased in value by virtue of the courts' section 363(f) orders, and IDOR was therefore not entitled to any remuneration for its interest under section 363(e). The thrust of IDOR's appeals is that because its ability to hold the purchasers personally liable for the taxes had real value, as the district judges recog-

nized, the purchase price for the debtors' properties necessarily included some amount of consideration for the removal of IDOR's interest. As IDOR sees things, then, it does not matter whether the purchasers had other assets apart from the purchased properties from which IDOR might have sought to collect the delinquent taxes. The purchasers have already paid something for (the removal of) IDOR's interest, and IDOR is entitled to that portion of the sale proceeds.[3]

Section 363(f) of the Bankruptcy Code authorizes the trustee to sell property of the estate free and clear of any interest held by an entity other than the estate itself. Needless to say, removing the encumbrances on estate property makes the property more attractive to potential purchasers, thereby boosting the sale price and maximizing the recovery for creditors of the estate. *See Precision Indus., supra*, 327 F.3d at 548; *Douglas v. Stamco*, 363 F. App'x 100, 102–03 (2d Cir. 2010) (non-precedential decision); *Diogo-Carreau v. Am. Home Mortg. Acceptance, Inc.*, 167 F. Supp. 3d 258, 263 (D. Mass. 2016); *Elk Grove II*, 541 B.R. at 676; *see generally Toibb v. Radloff*, 501 U.S. 157, 163, 111 S. Ct. 2197, 2201 (1991) ("Chapter 11 …

---

[3] IDOR did not waive this argument, as the banks suggest it did. To the extent that the district court rejected the argument in each instance below, IDOR was not required to take an immediate appeal to this court in order to preserve it. In both cases, the district court remanded the matter to the bankruptcy court for further consideration as to the value of IDOR's interest for purposes of section 363(e). This was by no means a ministerial task on the part of the bankruptcy court, and so the judgments were not final at the time the cases were remanded. *See, e.g.*, *In re Ferguson*, 834 F.3d 795, 798-800 (7th Cir. 2016). IDOR was thus entitled (indeed, required) to wait until the remands were resolved before pursuing the issue in this court.

embodies the general Code policy of maximizing the value of the bankruptcy estate").

However, section 363(e) qualifies this power in providing that, upon the request of an entity holding an interest in the property to be sold, the court "shall prohibit or condition such … sale … as is necessary to provide adequate protection of such interest." Section 361(1) in turn provides that when adequate protection is called for under section 363, it may be provided in the way of cash payments compensating the affected entity for the decrease in the value of its interest. In short, an entity whose lien or other interest is removed from property in order to facilitate its sale is entitled to compensation for whatever loss the removal causes the entity. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370–71, 108 S. Ct. 626, 630 (1988). Typically, the entity is compensated from the proceeds of the sale. *See Precision Indus.*, 327 F.3d at 548; *In re Nov. 2005 Land Investors, LLC*, 636 F. App'x 723, 726 (9th Cir. 2016) (non-precedential decision).

As a threshold matter, we assume without deciding that IDOR's authority to impose successor liability for unpaid taxes on the purchaser in a bulk sale constitutes a cognizable "interest" in a debtor's property for purposes of section 363. *See In re Elk Grove I*, 510 B.R. at 603, and cases cited therein; *see generally Precision Indus.*, 327 F.3d at 545 (indicating that the term should be construed broadly). Judge Barnes expressly held in IDOR's favor on this point, 510 B.R. at 603, although Judge Goldgar found it unnecessary to decide the issue, *see* n.2, *supra*. The pertinent fact for our purposes, however, is that in neither case did anyone contest the point on appeal to the district court, leading both Judge Blakey and Judge Der-

Yeghiayan to consider the point either undisputed or unnecessary to resolve. *Elk Grove II*, 541 B.R. at 676; *Naperville Theater*, 2016 WL 930659, at *2. Although the Chapter 7 Trustee attempts to resurrect the issue in this court, it is too late in the day for the parties to reopen this issue. We shall proceed on the assumption that IDOR had an interest that was entitled to adequate protection under section 363(e).[4]

What the bankruptcy court was thus required to resolve was the extent to which the value of IDOR's interest under the Bulk Sales Provisions decreased when, in each case, the court permitted the properties to be sold free and clear of that interest. That assessment requires a review of the relevant provisions of Illinois law. *See Barnhill v. Johnson*, 503 U.S. 393, 397–98, 112 S. Ct. 1386, 1389 (1992); *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 918 (1979); *Hoornstra v. United States*, 969 F.2d 530, 532 (7th Cir. 1992); *Bjork v. United States*, 486 F.2d 934, 937 (7th Cir. 1973).

IDOR's interest rests on the Bulk Sale Provisions found in section 902(d) of the Illinois Income Tax Act, 35 ILCS 5/101 *et seq*. and section 5j of the Retailers Occupation Tax Act, 35 ILCS 120/1 *et seq*. These provisions apply when a taxpayer sells the

---

[4] We may also assume, contrary to UCB's suggestion, that the Bulk Sales Provisions would apply (absent a section 363(f) order) when the property is being sold by a trustee in bankruptcy subject to the bankruptcy court's permission and oversight. UCB has advanced this argument largely as a matter of policy rather than statutory interpretation. The Bulk Sales Provisions themselves do not exempt sales taking place in the course of bankruptcy proceedings, and although the trustee may not literally be the "taxpayer" to which these provisions refer, he certainly acts on the taxpayer's behalf. In any case, given the other grounds on which we dispose of IDOR's appeals, we need not reach this contention.

majority of its assets (including real property) outside of the normal course of business, as in a liquidation. Pursuant to those provisions, the purchaser in a bulk sale must give notice of the purchase to IDOR. If there are outstanding state taxes owed by the seller, IDOR may within ten business days issue a "stop order" instructing the purchaser to reserve a portion of the purchase monies sufficient to cover the estimated amount of outstanding taxes owed by the business. IDOR then has another 60 business days to calculate the actual amount of taxes owed and to issue a revised stop order with the updated tax bill and directing the purchaser to continue holding in reserve the portion of the purchase price set aside previously for unpaid taxes. If the seller thereafter fails to pay the outstanding taxes, IDOR may issue a demand to the purchaser to turn over the withheld funds, and the purchaser "shall pay" to the Department the amount so withheld from the purchase price. A purchaser who fails to give IDOR notice of a bulk sale, or fails to withhold the amount specified in a stop order, or fails to turn over the withheld funds at IDOR's demand becomes personally liable to IDOR for the amount of unpaid taxes owed by the seller up to the reasonable value of the property acquired by the purchaser. *See* 35 ILCS 5/902(d); 35 ILCS 120/5j; 86 Ill. Admin. Code §130.1701.

The Bulk Sale Provisions give IDOR a unique and powerful weapon in the pursuit of delinquent taxes, with important consequences for what and how a purchaser would pay for property affected by those provisions. Faced with the prospect of being held personally liable for a seller's unpaid taxes, a reasonable purchaser would take steps of its own to make certain that unwelcome event never came to pass.

In this regard, it is important to note that setting aside a portion of the purchase money in compliance with a stop order from IDOR does not by itself ensure either that IDOR will be paid from those funds or that the purchaser will be discharged from liability to IDOR. A business with a significant tax liability to IDOR is likely to have other debts as well; and the business's other creditors may have a superior claim to the sale proceeds—including any portion of the proceeds the purchaser set aside at IDOR's direction. IDOR's power to compel a purchaser to reserve a portion of the proceeds for the Department's benefit does not isolate the reserved funds from the claims of other creditors. *See Bjork v. United States*, *supra*, 486 F.2d at 938 (bulk sale statute authorizing IDOR to issue stop order "does not purport to vest ownership of the held fund in the State"). A purchaser faced with competing claims to the set-aside funds can, of course, file an interpleader action and ask a court to decide who has the superior claim to the funds. *See* 28 U.S.C. § 1335; Fed. R. Civ. P. 22; 735 ILCS 5/2-409; *see also*, *e.g.*, *Bjork*, 486 F.2d at 939 (concluding in interpleader suit that federal Internal Revenue Service had superior claim to withheld funds notwithstanding stop order issued by IDOR). But, as IDOR asserts, setting aside and interpleading the funds does not necessarily discharge the purchaser's obligations under the Bulk Sales Provisions. In the event the interpleader court determines that another creditor has a superior claim to the funds, the purchaser, under a broad reading of the Bulk Sales Provisions, may nonetheless be held liable to IDOR for failing to withhold *and pay* those reserved funds to IDOR.

Courts in other jurisdictions have concluded that a bulk sales stop order requires a purchaser not simply to reserve a

portion of the purchase money sufficient to cover the outstanding tax liability but to do so *for the benefit of* the state taxing authority. These courts construe bulk sale provisions to impose essentially strict liability on the purchaser for taxes left unpaid by the property's seller, such that if another creditor lays claim to the set-aside funds and the purchaser is compelled to turn over the funds to that creditor, the purchaser remains liable to the state for the outstanding tax debt. *See Schnyder v. State Bd. of Equalization*, 124 Cal. Rptr. 2d 571, 577–79 (Cal. Ct. App. 2002) (holding purchasers liable to state for unpaid taxes after court in interpleader action had determined that IRS had superior claim to funds withheld pursuant to stop order); *Red, White & Blue Transmission, Inc. v. Dep't of Revenue Servs.*, 690 A.2d 437, 439–40 (Conn. Super. Ct. 1994) (transmitting funds to trustee for resolution of competing creditor claims does not insulate purchaser from liability to state). Although IDOR does not cite, and we have not found, any Illinois case law on this point, we may assume (as a purchaser might) that Illinois courts likely would follow this line of authority. The Illinois statutes themselves state explicitly that in the event the seller of the property has failed to pay the outstanding taxes and IDOR has issued timely instructions to the purchaser to withhold funds for the tax delinquency, the purchaser "*shall pay* to the Department the amount so withheld from the purchase price." 35 ILCS 5/902(d) (emphasis added); *see also* 35 ILCS 120/5j (nearly identical wording). IDOR's letter rulings reflect the same view. *See* IDOR Letter No. 96-0114, 1996 WL 699622, at *1 (Aug. 26, 1996) ("If the Transferee fails to report to the Department, withhold the requisite amount, *or pay over the withheld amount* when required, the Transferee will become personally liable for the outstanding state tax liabilities of the Transferor, up to the amount of

the value of the property transferred.") (emphasis added); IDOR Letter No. 90-0406, 1990 WL 207605, at *1 (Jul. 5, 1990) (same); IDOR Letter No. 87-0624, 1987 WL 53814, at *1 (Aug. 19, 1987) (same); *but see also* 2 Ill. Admin. Code § 1200.110(a) (IDOR general information letters do not constitute agency policy and do not bind IDOR); *id.* § 1200.120(c) (IDOR private letter rulings only binding as to taxpayer that requested ruling).[5]

---

[5] The banks have asserted that a purchaser would be discharged from liability in an interpleader action—in other words, that the purchaser would have satisfied its obligation to IDOR by withholding the requisite funds pursuant to the stop order, interpleading the funds, and allowing a court to decide, as between IDOR and the seller's other creditors, who had the superior claim to the withheld funds. Banks Br. 25-26. But this assumes that the purchaser is a neutral stakeholder with no independent liability to IDOR. *See John Hancock Life Ins. Co. (U.S.A.) v. Jacobs*, 2014 WL 587521, at *1 (D. Nev. Feb. 13, 2014); *Metro. Life Ins. Co. v. Mitchell*, 966 F. Supp. 2d 97, 103 (E.D.N.Y. 2013). Arguably, however, the purchaser would *not* be a neutral stakeholder. As we have noted, the Bulk Sales Provisions on their face impose a duty on the purchaser not simply to withhold funds from the purchase price, but to turn over those funds to IDOR in the event that the seller does not make good on its outstanding tax obligations. Assuming that Illinois courts would follow cases like *Schnyder*, the purchaser would remain personally liable to IDOR if it filed an interpleader suit and the court presiding over that suit determined that the bank or another creditor of the seller had a superior claim to the withheld funds; in that event, the purchaser would have "failed" to remit the withheld funds to IDOR. *See Schnyder*, 124 Cal. Rptr. at 577 (by filing interpleader action, purchasers failed to "withhold" funds from the purchase monies as required by bulk sales statute, in sense that they did not make withheld funds available to state agency for satisfaction of outstanding tax liability). Put another way, an interpleader action may relieve the purchaser of having to decide who has the superior claim to the withheld funds. *See, e.g.*, *United States v. Federative Republic of Brazil*, 748 F.3d 86, 95 (2d Cir. 2014); *Bank of N.Y. Mellon Trust Co., N.A. v. Telos CLO 1006-1 Ltd.*, 274 F. Supp. 3d

Against this backdrop, it is not hard to appreciate IDOR's position that it would be worth something to a bulk-sale purchaser to be able to make its purchase free and clear of IDOR's interest and thus have no worry about successor liability—and that the sale price for the debtors' properties in these cases necessarily included a premium for the removal of that interest. The question is what value to place on the removal. IDOR appears at times to assume that, but for the bankruptcy court's free-and-clear orders, it likely would have recovered the entirety of the taxes owed given its ability to pursue the purchasers personally. For that reason, IDOR places a correspondingly high value on the removal of its interest and the compensation to which it is entitled under section 363(e): 100 percent of the outstanding tax debt (up to the amount of the sale price). But we are dubious of the notion that IDOR was likely to have recovered all of the outstanding taxes but for the removal of its interest; and for purposes of placing a value on IDOR's interest for purposes of section 363(e), we must consider what IDOR realistically could have recovered from the purchaser.

We may deal with IDOR's argument on its own terms without attempting to resolve the conflict it poses with the priority scheme reflected in the Bankruptcy Code. *See* 11 U.S.C. § 507. There is no dispute that IDOR's claims against the debtors were inferior to those of the banks and that, given the size of the banks' claims vis-à-vis the proceeds of the prop-

---

191, 214 (S.D.N.Y. 2017); *Amalgamated Trust & Sav. Bank v. Silha*, 460 N.E.2d 372, 377 (Ill. App. Ct. 1984). But it does not necessarily relieve the purchaser of its independent liability to IDOR for the outstanding taxes under the Bulk Sales Provisions.

erty sales, IDOR ordinarily would be "out of the money." According IDOR a right to claim any portion of the sale proceeds would, in a real sense, permit IDOR to jump the queue of creditors and grant IDOR monetary protection for its interest at the expense of other creditors. The banks describe this as awarding IDOR a *post hoc* priming lien that permits IDOR to assume first place in the creditor queue.[6] We do not take this prospect lightly. *See, e.g.*, *In re R.J. Dooley Realty, Inc.*, 2010 WL 2076959, at *7 (Bankr. S.D.N.Y. May 21, 2010) (criticizing notion that debtor's tenant might be entitled to adequate protection under section 363(e) given sale of debtor's property free and clear of tenant's leasehold interest, as reimbursement from sale proceeds would permit tenant to "catapult … ahead of its position behind secured, administrative, and priority unsecured creditors, in complete contravention of the priorities of the Bankruptcy Code").

What distinguished IDOR from other creditors, however, was its right to look beyond the debtor's assets and to hold the purchasers of those assets personally liable for the taxes it was owed. To that extent, the bankruptcy court's free-and-clear orders arguably deprived IDOR of a power and interest that no other creditor possessed. So arguably IDOR is not so

---

[6] Whatever other rights the bulk sale provisions convey to IDOR, they do not permit IDOR's claim to the proceeds of a bulk sale to take priority over the superior claims of other creditors. "Nothing in this Section shall be construed to give the Department a preference over the rights of any bona fide purchaser, holder of a security interest, mechanics lienholder, mortgagee, or judgment lien creditor arising prior to the filing of a regular notice of lien. …" 35 ILCS 5/1103(a); 35 ILCS 120/5a. In this respect, the bulk sale provisions are consistent with other provisions of Illinois law. *See* 810 ILCS 5/9-322(a)(1) (security interests rank according to priority in time or perfection).

much demanding permission to cut ahead of other creditors as it is insisting on recognition that it had a unique interest that no other creditor had and which extended beyond the corpus of the bankruptcy estate. Put another way, to the extent the price the purchaser paid for the debtor's property indeed does reflect a premium for the removal of IDOR's right to impose successor liability for the taxes on the purchaser, that consideration, whatever it may be, is attributable to IDOR rather than any asset of the estate. We shall therefore assume without deciding that a court could place a value on IDOR's right and compensate IDOR accordingly from the proceeds of the section 363 sale, even if that would reduce the recovery to other, more senior creditors.

But the question, again, is what value to place on IDOR's right to hold a purchaser personally liable for unpaid taxes. Although we can find no fault in the abstract with IDOR's theory as to the unique value of its interest, the notion that it stood to recover 100% of its claim for unpaid taxes but for the bankruptcy court's free-and-clear orders runs into several pragmatic obstacles. Inside or outside of bankruptcy, the seller, its creditors, and prospective purchasers all would be cognizant of IDOR's right to pursue a purchaser for unpaid taxes. No reasonable, informed purchaser would agree to sale terms that left it unprotected against IDOR; and for their part, the banks, as the debtors' senior-most creditors, would not agree to any sale scenario in which IDOR stood to recover 100% of its claim from the purchase money at the banks' expense.

A prudent purchaser in a bulk sale would take protective measures over and above complying with a stop order in order to shield itself from personal liability to IDOR. A buyer

can always, for example, insert a clause in the purchase agreement requiring the seller to pay the delinquent taxes (and produce proof that it has done so) and/or to hold the buyer harmless for any liability to IDOR. But assuming that the seller lacks the resources to clear the tax debt itself, the buyer alternatively might structure the purchase agreement in such a way as to expressly reserve a portion of the purchase money for the (exclusive) benefit of IDOR in order to satisfy the tax liability and thereby insulate the reserved funds from the claims of other creditors—even those whose claims are senior to those of IDOR. *See Hoornstra*, *supra*, 969 F.2d at 533–34 (where purchase agreement called for portion of purchase money to be placed in escrow and conditioned payment to seller on satisfaction of outstanding tax liabilities, and IDOR issued timely stop order once notified of sale, seller did not acquire beneficial interest in reserved funds that would permit IRS as senior lienholder to take reserved funds ahead of IDOR as it had in *Bjorn*). Alternatively, the purchaser might insist that the price of the property be reduced to account for the risk that complying with the stop order might not be enough to protect the purchaser from being held personally liable to IDOR.[7]

IDOR might be indifferent to such measures, as none of them would undermine its ability to collect the unpaid taxes, but the debtors' senior creditors—here, the banks—surely would not be indifferent. In any case where a debtor's assets are insufficient to cover its debts, a reduction in the purchase

---

[7] Or the purchaser might simply walk away from the transaction. *See Schnyder*, 124 Cal. Rptr. at 579.

price or segregation of purchase funds for the sole benefit of IDOR will decrease a senior creditor's recovery in a situation where that creditor already faces substantial losses. And in these cases, the banks were not without their own weapon to prevent IDOR from obtaining recompense at their expense: the ability to foreclose on the properties.

One of the few points of agreement among the parties is that a foreclosure does not trigger the Bulk Sales Provisions. *See* 86 Ill. Admin. Code § 130.1701(g)(3) ("A repossession of equipment and inventory by a lender upon default by a borrower does not constitute a transfer within the meaning of the Bulk Sales provisions of the Act."); IDOR Letter No. 11-0096, 2011 WL 7014975, at *4 (Dec. 7, 2011) ("if the successor does no more than repossess or foreclose on property that is the subject of a note and mortgage or security interest, we do not believe that the situation is subject to the bulk sales reporting requirements because no 'sale or transfer' within the statutory meaning has occurred"); IDOR Letter No. 87-215, 1987 WL 53678, at *2 (Aug. 26, 1987) ("The Department has a standing policy of not enforcing either [bulk sales] statute in judicial and non-judicial foreclosure actions."); IDOR Br. 34 n.11 ("While the regulation [§ 130.1701(g)(3)] refers to the repossession or foreclosures of personal property, IDOR in practice extends it to the foreclosure of realty."); IDOR Br. 31–32 n. 8 ("IDOR does not assert successor liability under the Bulk Sales Provisions in federal foreclosure cases just as it does not do so in state foreclosures"). Thus, if the banks had decided to foreclose on the properties, there would have been no need to set aside funds for the taxes owed to IDOR and IDOR would have had no right to pursue the banks for the outstanding tax debt. It would be as if the properties had not changed hands at all. By virtue of their foreclosure authority, the banks

thus had the power to veto any sale terms that favored IDOR at the expense of the banks.[8]

Of course, foreclosure comes with significant costs and can ultimately reduce the net recovery to a bank once it disposes of the property. IDOR's able counsel therefore was no doubt correct when he asserted at oral argument that the power to foreclose is one the banks will be reluctant to use. But when, as in these cases, the taxes owed to IDOR run into the millions of dollars, we doubt that a lender would hesitate to use (or at least threaten) foreclosure in order to prevent IDOR from skimming a substantial portion of the sale proceeds for itself and to maximize its own recovery.[9]

Given that the banks and IDOR both have the means to block a sale that does not adequately address their respective interests in compensation, a compromise as to the allocation of sale proceeds is likely the only way that a bulk sale would proceed in a case where the seller's assets fall short of making whole even the senior-most creditor, let alone that creditor and IDOR both. A compromise, of course, would entail the bank agreeing to let IDOR, notwithstanding its status as a junior creditor, take some portion of the sale proceeds in exchange for releasing the purchaser from successor liability for unpaid taxes, and IDOR agreeing to accept something less than 100 percent of the amount that the Bulk Sales Provisions

---

[8] If the property owner were in bankruptcy, the bank of course would have to ask the bankruptcy court to lift the automatic stay in order to allow it to pursue the foreclosure in state court.

[9] We are told, for example, that the taxes owed by one of the five Elk Grove stations exceeded the sales price for that station by a multiple of three. So any arrangement that prioritized payment of the sale proceeds to IDOR would have left the bank with nothing as to that station.

would allow it to collect. We can be confident that these types of deals are more than an abstract possibility. IDOR's own counsel confirmed at oral argument that it negotiates compromises with lenders on a regular basis.

This is where the wheels come off the wagon of IDOR's argument. Recall that for purposes of determining the compensation putatively owed to IDOR under section 363, section 361(1) directs us to consider how much the value of IDOR's interest decreased as a result of the bankruptcy courts' free-and-clear orders. IDOR's go-for-broke position insists that it should be reimbursed for the full amount of the tax delinquency it was authorized to collect from the purchasers. But, for the reasons we have set out, it is not at all likely that IDOR in fact would have recovered those taxes in full from the purchasers in these cases. It might have struck a deal with the banks and/or the purchasers to recover something less than 100 percent of the taxes, but at no point in the proceedings has IDOR offered any evidence, or articulated any methodology, by which we could determine how much it might have recovered in such a deal and in turn the extent to which the value of its interest decreased when the bankruptcy court lifted its interest from the debtors' properties.

In its reply brief, IDOR suggests that the likelihood of its being able to collect the delinquent taxes from a purchaser is irrelevant to the value of its interest and that the bankruptcy court was therefore wrong to consider, for example, what resources, if any, the purchasers in these cases had available to pay the taxes (IDOR Reply at 23–24); but we do not see why this is so. Sections 361(1) and 363(e) call for a creditor to be compensated for the decrease in value of its interest. If, as a practical matter, IDOR's right to impose successor liability on

the purchaser was worth nothing, or worth something less than the full amount of the taxes IDOR was owed, then as a logical matter that fact necessarily informs the determination of whether and by how much the value of IDOR's interest decreased by virtue of the bankruptcy court's free-and-clear orders and of what compensation IDOR is owed for the decrease. *See*, *e.g.*, *In re Martin*, 761 F.2d 472, 475–78 (8th Cir. 1985). As Judge Blakey pointed out, an interest that is cognizable under section 363(e) and (f) may be worth nothing, in practical terms, in which case the interest-holder is entitled to no compensation pursuant to section 363(e) and 361(1). *See Elk Grove II*, 541 B.R. at 678 (collecting cases).

We have not forgotten IDOR's contention that the purchasers have already paid a premium for the removal of IDOR's interest, such that there is no need to consider what IDOR realistically might have been able to demand from a purchaser and whether the purchaser had the means to pay it; but we are still faced with a problem of valuation. Whatever premium the purchasers might have paid for the removal of IDOR's interest would have been informed (and discounted) by the likelihood of IDOR being able to collect on its interest. Given the realities we have discussed, it is not at all likely that any premium the purchasers may have paid came close to the figure that IDOR nominally was entitled to collect from the purchasers under the Bulk Sales Provisions.

As should be clear by now, we are placing the responsibility for the failure of proof as to the value of IDOR's interest on IDOR itself. No issue has been raised in these appeals as to the proper allocation of the burden of proof on this point. IDOR itself notes several times in its brief that the bankruptcy court in both cases concluded that IDOR failed to sustain its

burden of proof to establish the value of its successor liability interest. IDOR Br. 7, 22, 38. Although IDOR faults the conclusion that the value of its interest was not proven, it does not quarrel with the notion that the burden to establish that value belonged to it. We note that there is at least some authority that for purposes of section 363(e), a creditor claiming the right to adequate protection bears only the minimal threshold burden of establishing the validity, priority, or extent of its interest, whereas the debtor (or trustee) must shoulder the initial burden of establishing what constitutes adequate protection vis-à-vis that interest—including the value of the creditor's interest and any decrease therein. *See In re AMR Corp.*, 490 B.R. 470, 477 (S.D.N.Y. 2013); 11 U.S.C. § 363(p). But we need not explore the point, as IDOR has waived any contention as to the burden of proof.

As there is no evidence as to what IDOR likely would have collected from the purchasers but for the bankruptcy court's section 363(f) free-and-clear orders, there is no way to determine what decrease in value the section 363(f) orders caused or what, if any, consideration the purchasers paid specifically to buy the properties free and clear of IDOR's interest under the Bulk Sales Provisions. No matter which party bore the burden of proof on this point, the failure of proof precludes a meaningful assessment of the value of IDOR's interest. The bankruptcy courts therefore did not err in valuing IDOR's interest at zero for purposes of its right to adequate protection under section 363(e).

### III.

For all of the foregoing reasons, the judgments of the bankruptcy court are affirmed.